IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**DAVIS A. PHELPS,**  )
)
    Plaintiff,  )
)
V.  )  Civil No. **07-06-WDS-CJP**
)
**MICHAEL J. ASTRUE[1],**  )
**Commissioner of Social Security,**  )
)
    Defendant.  )

## REPORT AND RECOMMENDATION

This report and recommendation is respectfully submitted to United States District Judge William D. Stiehl pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).

Pursuant to 42 U.S.C. § 405(g), plaintiff Davis A. Phelps, represented by counsel, is before the Court seeking review of the final decision of the Social Security Administration denying his Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i). **(Doc. 2).** In addition to submitting the administrative record **(Doc. 9 (hereinafter "T."))**, plaintiff and defendant have fully briefed their positions. **(Docs. 12 and 15).**

Plaintiff Phelps' physical and psychiatric ailments are not in dispute, per se. Rather, this appeal centers around plaintiff's pain and its impact on plaintiff's ability to work.

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is, therefore, automatically substituted as the defendant in this civil action, and no further action is necessary to continue this case.

## Synopsis of Plaintiff's Physical Impairments
## and the Relevant Procedural History

In July 2003, plaintiff applied for DIB, alleging the onset of disability as of June 10, 2003. **(T. 54-57).** Plaintiff had been working as a clerk in a sporting goods store, but had to stop due to his ailments. **(T. 75).** As the plaintiff's brief summarizes:

> Plaintiff, Davis Phelps, is a 26 year-old individual. He asserts he became disabled on June 10, 2003 (T 55). Plaintiff had two automobile accidents, one in 1997 and the second in 1999 resulting in back pain (T 122-206; 243-250; 297; 334). On June 14, 1997, plaintiff was diagnosed with juvenile epiphysitis[2] and multiple rotation and flexion misalignments throughout the upper as well as mid cervical spine (T 335). Plaintiff's condition was also diagnosed as consistent with thoracolumbar strain with associated disc bulge (T 310). This diagnosis was later upgraded to chronic thoracal lumbar strain (T 275-305). On November 22, 1999, plaintiff underwent an MRI scan and on June 22, 2000, a CT scan with both showing a left L5-S1 disc bulge with annular tearing and disc bulging at L4-5, and degenerative disc change and disc bulging creating stenosis at L3-4 (T 195-199). As a result of the pain, plaintiff underwent fluoroscopically guided S1 selective nerve root block, a regional epidural block on December 12, 2000 (T 141) and intradiscal electrothermal annulopasty on two occasions, July 26, 2000, and April 12, 2001 (T 109; 151).
>
> Plaintiff has also been diagnosed with brachyolmia[3] (T 220) and a congenitally shortened upper segment as opposed to his lower segment of approximately two and one half standard deviations below the mean (T 228). He was again diagnosed with marked thorocolumbar platyspondylia[4] with mild lumbar scoliosis of about 12 degrees (T 229; 237-242). An MRI done on June 5, 2000, revealed endplate depressions of all lumbar vertebrate and a narrowing of the spinal canal at L2, L3-4, and L4-5 (T 254-255).
>
> A myelogram of plaintiff's spine conducted on February 14, 2001, demonstrated disc bulges at all levels of the lower thoracic and lumbar spine,

---

[2]Inflammation of an epiphysis, esp. that at the hip, knee and shoulder in infants. **Dena Ramras Vardara editor, Taber's Cyclopedic Medical Dictionary 17th Edition (1993).**

[3]Brachyolmia characterized by childhood onset short trunk-short stature. Profession Raul Hennekam editor, Brachyolmia, Orphanet Encyclopedia, July 2004. http:orpha.net/data/patho/GB/uk-brachyolmia.pdf.

[4]Flatness of the vertebral bodies. The Free Dictionary, http:medicaldictionary. thefreedictionary.com/platyspondylia.

decreased vertebral height and increased disc space with multiple Schmoral's modes with undulation of the vertebral end plates and mild canal stenosis (T 270). Another MRI done on February 13, 2001, showed degenerative disc disease, bulging at L1-L2, L2-L3 and L3-L4 and Schmoral's nodes with suspicion of osteochendrosis or Scheuermann's disease (T 271). A more recent MRI conducted on August 29, 2003, revealed all of the conditions identified from the February 2001 MRI and also demonstrated a congenital narrowing of the central canal at all levels with bulging discs (T 359).

**(Doc. 12, pp. 2-3 (footnotes renumbered and included)).**

Administrative Law Judge ("ALJ") George A. Mills, III, found that plaintiff had the following severe impairments: brachyolmia/spondyloepiphyseal dysplasia tarda and related deficits; degenerative back disease; and depression. **(T. 21).** Nevertheless, plaintiff was found capable of a limited range of sedentary work[5]. **(*See* T. 23 and 26-27).** Based on his age, education and vocational history, and taking into consideration the vocational testimony regarding possibly available jobs, ALJ Mills concluded plaintiff was not disabled. **(T. 26-27).** In November 2006, the Appeals Council denied plaintiff's request for review. **(T. 6-8).**

## The Standard of Review

To be entitled to disability insurance benefits the claimant must establish that he is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

---

[5]Although ALJ Mills did not specify the "sedentary" exertional level, his finding that plaintiff could lift no more than 10 pounds corresponds with that exertional category, and the vocational testimony repeatedly focused on sedentary jobs. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." **20 C.F.R. § 404.1567(a).**

3

can be expected to last for a continuous period of not less than twelve months." **42 U.S.C. § 423(d)(1)(A).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. § 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff is in fact disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. ***See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** Furthermore, an ALJ may not disregard evidence when there is no

4

contradictory evidence. *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984). If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at step four to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

### Evidence Relevant to Pain and Residual Functional Capacity

In July 2003, when plaintiff applied for benefits, he indicated his pain was worsening; doctors could do nothing for him; and he had to stay in bed almost all day. **(T. 85).** Shortly thereafter, in August 2003, he indicated he could lift no more than 10 pounds and he did no household chores. **(T. 82).** According to plaintiff, he needed assistance standing and walking; he held onto furniture to walk around his house, and he used a walker outside his home. **(T. 83).** Plaintiff stated that he could not sit for long drives; he could sit for 45-60 minutes before losing feeling in his legs; and he could stand for 20 minutes before numbness sets in. **(T. 83-84).**

Plaintiff's treating physician is Dr. Kimball Ewell. Dr. Ewell's treatment notes during the relevant time period reflect that plaintiff was generally seen once per month. **(T. 207-209, and 406-425).** Plaintiff had returned to Dr. Ewell for pain management after consulting with a neurosurgeon and going to the Mayo Clinic for evaluation. **(T. 208).** In July 2003, plaintiff reported that his pain was eight on a ten-scale, and he was prescribed MS Contin (an opioid

5

analgesic), Lortab (also a narcotic pain reliever) for breakthrough pain, Ambien to help him sleep, and the antidepressant Zoloft. **(T. 209).** In August 2003, plaintiff complained of severe back pain, rated at times as eight-to-nine on a ten-scale, even with pain medication. **(T. 208).** Dr. Ewell observed spasms (+2), pain radiating down plaintiff's left leg with some paresthesia of the thigh, and diminished left leg reflexes. **(T. 208).** Plaintiff was characterized as having intractable pain, and his MS Contin dosage was increased, with a warning that he should stop taking it if it makes him too sleepy. **(T. 208).** One month later, in September 2003, plaintiff went to the emergency room due to back pain. **(T. 210).**

According to the September 2003 Mayo Clinic report, based on observations made the previous month, despite physical therapy, injections, medication, and two IDET procedures, plaintiff's pain persists at a level of seven on a ten-scale, despite the MS Conting and Lortab. **(T. 348).** Plaintiff's gait was described as normal, a mild-to-moderate reduction in his spinal range of motion was observed, and nerve conduction studies of the left leg were normal. **(T. 348).** Plaintiff was given a back brace and told that it was doubtful that there was a surgical remedy for his back pain. **(T. 348).** In this same time frame, agency consulting physician Dr. B. Rock Oh reviewed plaintiff's medical records and opined that plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand and walk for at least two hours during an eight hour period, and sit for six hours during an eight hour period. **(T. 102).** Agency consulting physician Dr. Daniel V. Girzadas concurred with Dr. Oh's opinion, but also recognized plaintiff's continuing pain. **(T. 98).**

According to Dr. Ewell's notes, the increased dosage of medication was helpful, in that by late August 2003 plaintiff was described as doing much better, with pain at a level of six,

6

albeit with occasional breakthrough pain and spasm (+1).  **(T. 423).** Similarly, in September 2003, plaintiff's pain was considered well controlled with medication.  **(T. 421).**  In October 2003 plaintiff's pain was again described as controlled with medication, although back spasms were noted (+2).  **(T. 419).**  Between November 2003 and January 2004, plaintiff continued to experience chronic, intractable pain, rated between six and eight, and interfering with plaintiff's sleep.  **(T. 413, 415 and 47).**  Dr. Ewell's records from February and March 2004 indicate that if plaintiff did not take his medication his pain was ten on a ten-scale, but as long as he took medication his pain was controlled at a two-to-three level.  **(T. 409 and 411).**  In June 2004, plaintiff reported a "flare-up," rated as nine on the pain scale.  **(T. 406).**  Dr. Ewell's July 2004 assessment of plaintiff's ability to do work-related activities indicated plaintiff could sit, stand or walk for one hour at a time and/or for a total of two hours per activity per day.  **(T. 371).**  Plaintiff was limited to lifting and carrying five pounds frequently and ten pounds occasionally.  **(T. 371).**  It was noted that at that time plaintiff did not need an assistive device for ambulation.  **(T. 372-373).**

In August 2004 plaintiff testified before ALJ Mills.  Plaintiff elaborated that he stopped working in June 2003 because he was only able to go to work two or three times per week, which was unacceptable to his employer.  **(T. 505).**  Plaintiff stated that he continued to drive, and he rode in the car for one hour and forty-five minutes to the hearing, albeit with three stops due to numbness in his legs.  **(T. 504).**  Plaintiff described being unable to sit or stand for any length of time due to numbness in his lower back, despite always wearing a back brace.  **(T. 509-510 and 514).**  Plaintiff described being in never-ending, throbbing pain with aching, numbness and tingling.  **(T. 515).**  On that day plaintiff rated his pain as eight on a ten scale, even though

he was on medication, which usually provides relief. **(T. 516).** According to plaintiff, his medications make him lightheaded and dizzy, and interfere with his short-term memory, such that he has trouble following television shows, but he also reported occasionally surfing the internet for five or ten minutes at a time. **(T. 518-519).** Plaintiff reported sleeping only three or four hours per night, due to pain. **(T. 520-521).** Plaintiff estimated he could lift no more than five pounds, sit for 30 to 60 minutes, walk as far as 100 yards, and stand for 20 minutes. **(T. 517-518).** Plaintiff testified that he cannot always dress himself without assistance, and he only shaves and bathes about once per week. **(T. 521).**

According to plaintiff, his condition was worsening. **(T. 527).** Plaintiff indicated his pain upon waking was usually ten on a ten-scale, improving to seven when he first takes his medication, but worsening as the day progresses. **(T. 526-527).** Plaintiff testified that he lives with his parents and does no chores, although he indicated he would be capable of fixing himself lunch and he used the microwave. **(T. 521-523).** Plaintiff described socializing, hunting using a 4-wheeler to get to the cite, and fishing from a boat for anywhere from 20 to 90 minutes. **(T. 523 and 530-531).**

From September 2004 through April 2005, plaintiff consistently described his pain as between eight and nine on a ten-scale, which interfered with his sleep. **(T. 481-488).** In September 2005, Dr. Lori M. Guyton, a neurologist, opined that plaintiff had likely not reached his maximum medical improvement due to lack of exercise, lack of neuropathic pain medications, and continued use of a back brace. **(T. 475).** Dr. Guyton thought plaintiff's pain threshold and tolerance could be improved. **(T. 475).** Dr. Guyton estimated that plaintiff could lift and carry up to 50 pounds occasionally and 25 pounds frequently, stand and walk at least two

8

hours out of an eight hour period, and sit for six hours out of an eight hour period. **(T. 476-477).** In February 2006, Dr. Ewell, plaintiff's treating physician, offered a second assessment, wherein he opined plaintiff could not stand, walk, sit, or utilize a sit/stand option, and plaintiff could lift and carry no more than ten pounds– all due to severe, chronic, intractable pain. **(T. 494).**

Plaintiff testified at a second hearing before ALJ Mills in March 2006. For the most part, plaintiff merely reconfirmed his prior testimony. Plaintiff rated his pain at a level nine on the day of the second hearing, although he acknowledged that medication did give him some relief. **(T. 552).** Plaintiff stated that his medications slow his comprehension, make him dizzy, drowsy and sweaty, affect his coordination and speech, and impair his short-term memory. **(T. 553, 555 and 562-563).** Plaintiff also stated he uses sleeping pills, but still only sleeps three or four hours per night. **(T. 557).** Plaintiff described not being able to ever find a comfortable position. **(T. 553).** He estimated he could walk 75 to 100 yards, stand for 15 minutes, lift no more than five pounds, and sit for 30 to 60 minutes. **(T. 553-555).** Plaintiff also indicated he used a computer every couple of months for five to ten minutes at a time. **(T. 555).** Plaintiff reiterated that he continues to fish and hunt. **(T. 564).** Nevertheless, plaintiff testified that for ten to 15 days per month he was unable to do anything. **(T. 564-565).**

Dr. William Houser, a medical expert, attended the March 2006 hearing and reviewed plaintiff's medical records. **(T. 565).** Dr. Houser opined that plaintiff could lift 20 pounds occasionally and ten pounds repeatedly, had to limit prolonged walking and standing, but may alternate, and a sit/stand option was reasonable, given plaintiff's condition. **(T. 571).** Dr. Houser concurred with Dr. Oh's and Dr. Girzadas' assessments, but rejected Dr. Guyton's opinion insofar as she thought plaintiff could lift 25 to 50 pounds. **(T. 571-575).** Dr. Houser

9

rejected Dr. Ewell's two evaluations, noting that they were inconsistent with plaintiff having ridden over an hour to the hearing and sitting through the hearing. **(T. 587-588).**

Vocational expert Dr. Thomas Upton testified at the March 2006 hearing. The ALJ presented a hypothetical based on a person who could lift 20 pounds occasionally and ten pounds frequently, but could only walk and stand for two hours of an eight hour day, and sit for six hours. **(T. 580).** Dr. Upton did not think such a person was physically capable of performing plaintiff's past work, due to a diminished ability to sit and walk. **(T. 579-580).** However, even if such a person's pain and depression further limited him to unskilled work, sedentary unskilled work would be possible, such as cashier, hand packer, receptionist, production inspector and surveillance monitor– all available in substantial numbers in the State of Illinois. **(T. 581).** Dr. Upton opined that, based on plaintiff's testimony and Dr. Ewell's evaluations, all work would be eliminated. **(T. 584-586).**

## **ALJ Miller's Decision**

ALJ Mills found that plaintiff had the following severe impairments: brachyolmia/spondyloepiphyseal dysplasia tarda and related deficits; degenerative back disease; and depression. **(T. 21).** However, none of those ailments, individually or in combination, were found to meet or equal any of the presumptively disabling ailments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A. **(T. 22).**

In his discussion of plaintiff's depression and whether it constituted a presumptively disabling condition, ALJ Mills noted that plaintiff drives, fishes, hunts, goes to the store, and has a girlfriend, thereby demonstrating no significant social limitation. **(T. 22).** The ALJ further

recognized plaintiff's sleeping troubles attributable to pain, as well as sleepiness, coordination difficulties stemming from medications– problems impacting plaintiff's ability to concentrate, and his persistence and pace. **(T. 22-23).** However, the ALJ again cited plaintiff's driving, fishing and hunting without significant difficulty as evidence that plaintiff's mental impairment was not disabling. **(T. 23).** The ALJ also observed plaintiff was taking Cymbalta for depression, but no other treatment. **(T. 22-23).** Ultimately, it was found that plaintiff's pain and depression limit him to only simple, routine tasks. **(T. 23).**

The ALJ further found that plaintiff was capable of lifting and carrying a maximum of 10 pounds, standing/walking for two hours out of an eight hour period, sitting for six out of eight hours. **(T. 23).** The ALJ did find certain postural limitations that precluded plaintiff from climbing and required avoidance of heights and moving machinery. **(T. 23).** It was acknowledged that plaintiff's impairments could reasonably be expected to produce the alleged symptoms; however, plaintiff's statements regarding the intensity, duration and limiting effects were not found fully credible. **(T. 23-24).**

In assessing plaintiff's credibility, ALJ Mills compared and contrasted several pieces of evidence: (1) plaintiff's claim of pain rating nine on a ten-scale, versus Dr. Ewell's March 2004 notation that plaintiff's pain was improved to a level of two or three with medication; (2) plaintiff's August 2003 statement that he used a walker, versus August 2003 medical records reflecting a normal gait, normal neurological testing and Dr. Ewell's statement that plaintiff did not need an assistive device to walk; (3) plaintiff's pain allegations, versus his ability to sit and fish from a boat and ride a 4-wheeler to hunt; (4) plaintiff's claimed side effects from medication, versus his driving, occasional use of a computer, noted improvement with

11

medication, and plaintiff's apparent failure to mention the effects of pain and medication to his physician(s). **(T. 24).** The ALJ also noted that, even though plaintiff had briefly tried multiple modalities to achieve pain relief, Dr. Guyton had opined that plaintiff could be doing more to improve his pain threshold and tolerance. **(T. 24).**

The ALJ gave considerable weight to the August 2003 assessment of the agency reviewing physicians, Drs. Oh and Girzadas, who thought plaintiff was capable of the physical requirements of sedentary work. **(T. 25).** The ALJ similarly gave significant weight to Dr. Houser's opinion that, despite plaintiff's functional limitations due to spinal ailments, plaintiff retained the physical capacity necessary for sedentary work. **(T. 25).** Dr. Guyton's opinion was only given moderate weight, because the higher strength estimations were deemed inconsistent with the evidence and were similarly discounted by Dr. Houser. **(T. 25).**

Dr. Ewell's July 2004 assessment was given little weight because it was viewed as inconsistent with subjective notes regarding pain and not supported by objective evidence. **(T. 25).** Dr. Ewell's February 2006 assessment indicating plaintiff could not stand, walk, sit or alternate between sitting and standing, and could lift and carry no more than ten pounds was found entirely unsupported by the record. **(T. 25).** The ALJ was also persuaded by Dr. Houser's opinion that Dr. Ewell's opinions were not supported by the evidence and in contradiction to the fact that plaintiff drove over an hour to the 2006 hearing and sat for 90 minutes during the hearing. **(T. 25).**

Having concluded that plaintiff could not stand or walk for more than two hours and a small number of restrictions relating to concentration, postural and environmental restrictions, plaintiff was not found capable of the full range of sedentary work. Therefore, the ALJ

12

consulted with a vocational expert, who testified about the availability of jobs that met that profile. **(T. 26-27).**

## Analysis

As previously noted, this appeal only takes issue with ALJ Mills' evaluation of plaintiff's pain and its impact on plaintiff's ability to work. Plaintiff argues that the ALJ did not comply with Social Security Ruling 96-7p in evaluating his pain. Social Security Rule 96-7p requires an ALJ to specifically articulate the rationale for any credibility determination relative to the consideration of pain and its functional effects. ***Brindisi v. Barnhart*, 315 F.3d 783, (7th Cir. 2003).**

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." ... The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

***Brindisi*, 315 F.3d at 787 (quoting from SSR 96-7p).**

Plaintiff argues that the ALJ failed to build a logical bridge between the evidence and his conclusions. Essentially, plaintiff contends the ALJ cherry-picked and mischaracterized evidence. Furthermore, plaintiff asserts that the assessments of Dr. Houser and Dr. Guyton, which were given significant and moderate weight respectively, failed to address the impact of pain upon exertion over an extended period of time.

Although the ALJ's decision does not mention every piece of evidence, from this Court's perspective, the decision captures the various dichotomies relevant to assessing plaintiff's pain.

13

The "substantial evidence" standard does not require the ALJ to address every piece of evidence in his decision; "he must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning." **Johansen v. Barnhart, 314 F.3d 283, 287 (7th Cir. 2002).** Plaintiff's argument that the ALJ used instances of minimal activity, such as plaintiff's computer usage and shorter hunting and fishing trips, to discredit plaintiff's testimony is itself an example of cherry-picking. Reading the ALJ's decision as a whole, it becomes clear that the ALJ relied upon the totality of evidence and the numerous contradictions between plaintiff's subjective complaints and record evidence.

Initially, during August and September 2003, plaintiff's pain was subjectively rated between six and nine on a ten-scale, but plaintiff's gait was normal and his range of motion was mild to moderately impaired, with no nerve involvement. **(T. 208, 348 and 423).** Medical records do not reveal any limitations reported by plaintiff, or imposed upon plaintiff. Pain medication was increased and plaintiff's pain was described in September and October as controlled with medication, with some spasms. **(T. 208, 419 and 421).** Between November 2003 and January 2004, plaintiff continued to experience chronic, intractable pain, rated between six and eight, and interfering with plaintiff's sleep. **(T. 413, 415 and 47).** It would appear that medication was not effective, except that Dr. Ewell's records from February and March 2004 indicate that *if* plaintiff did not take his medication his pain was ten on a ten-scale, *but* as long as he took medication his pain was controlled at a two-to-three level. **(T. 409 and 411).** Therefore, one can only conclude that plaintiff did not always take his medication. The conclusion that plaintiff's pain was under control is further bolstered by the June 2004 notation of a "flare-up," rated as nine on the pain scale– implying that plaintiff's pain is not normally at a nine level. **(T.**

**406).**

When plaintiff testified in August 2004, approximately one year after the alleged onset of disability, the fact that he continued to drive, fished, rode a 4-wheeler and hunted stood in stark contrast to his subjective allegations of pain, and claimed inability to sit or stand for any length of time, and his inability to always dress himself. **(T. 509-510, 514-523 and 530-531).** The medical notes and the aforementioned activities bear some consistency, which is similarly reflected in the opinions of Drs. Oh and Girzadas. **(T. 98 and 102).**

Between the first hearing in August 2004 and the second hearing in March 2006, plaintiff's subjective complaints had changed little. From September 2004 through April 2005, plaintiff consistently described his pain as between eight and nine on a ten-scale, which interfered with his sleep. **(T. 481-488).** On the day of the second hearing, plaintiff described his pain as being at a level of nine. **(T. 552).** Plaintiff also testified he was unable to do anything for about 15 days per month. **(T. 564-565).** Nevertheless, plaintiff was still able to drive, fish, ride a 4-wheeler and hunt, and he was able to ride in the car and sit through the hearing for longer periods than he had estimated. **(T. 553-555, 564 and 587-588).** Again, plaintiff's activities belie his claimed degree of impairment. Moreover, the medical records do not record that plaintiff was incapacitated as he described.

Insofar as plaintiff notes that his medications were doubled between the first and second hearings **(T. 564)**, he misses the point. The increase is only relevant if it did not control the pain and the side effects became worse, all to a point where plaintiff's residual functional capacity would be diminished to the extent sedentary work would no longer be possible. The medical records only reflect plaintiff's subjective complaints. Again, plaintiff's daily activities did not

15

change during the time between hearings when his pain purportedly worsened. Therefore, there is a basis for the ALJ and Dr. Houser rejecting Dr. Ewell's February 2006 assessment that plaintiff could not stand, walk, sit, or utilize a sit/stand option, and plaintiff could lift and carry no more than ten pounds– all due to severe, chronic, intractable pain. **(T. 494).** Absent evidence of a change in plaintiff's condition between the two hearings, the agency consulting physician's opinions are still relevant. The findings of reviewing physicians can constitute substantial evidence in support of a decision, and the ALJ is entitled to rely on the conclusions of medical experts. *Cass v. Shalala*, **8 F.3d 552, 555 (7th Cir. 1993).**

With respect to the side effects of plaintiff's medications, during the first hearing he stated that his medications make him lightheaded and dizzy, and interfere with his short-term memory, such that he has trouble following television shows. **(T. 518-519).** At the second hearing, plaintiff testified that his medications slow his comprehension, make him dizzy, drowsy and sweaty, affect his coordination and speech, and impair his short-term memory. **(T. 553, 555 and 562-563).** Again, there is little or no apparent change between the two hearings. The fact that plaintiff continues to drive, fish, use a 4-wheeler, hunt and occasionally use a computer all undercut his purported degree of limitation. Moreover, as defendant notes, plaintiff did not indicate to his physician that he was adversely impacted by his medications, except that he had trouble sleeping, for which medication was prescribed..

Plaintiff's assertion that Drs. Houser and Guyton failed to address pain and its possible impact on plaintiff's functional capacity only highlights the fact that there is a glaring absence of evidence in the record of any such impact. Of course, both doctors based their opinions on plaintiff's medical record, which included plaintiff's medication history and Dr. Ewell's notes.

16

Dr. Gayton opined plaintiff might be helped with neuropathic pain medication. **(T. 473 and 475).** Dr. Houser not only reviewed the record, he also was present for plaintiff's testimony. Rather than base his opinion on plaintiff's subjective assertions, Dr. Houser relied on the other evidence in the record, which did not substantiate plaintiff's subjective complaints of pain and description of its impact.

As detailed above, there is substantial evidence in the record to support the ALJ's conclusions, and to adequately undercut plaintiff's subjective testimony– as illustrated by the numerous dichotomies discussed by ALJ Mills. There is no 12-month period within which plaintiff was not capable of a limited range of sedentary work.

## Recommendation

For the aforestated reasons, the Commissioner's decision denying plaintiff Davis A. Phelps' application for Disability Insurance Benefits or a Period of Disability should be affirmed in all respects, as the decision is supported by substantial evidence.

**SUBMITTED: February 20, 2008**

> s/ Clifford J. Proud
> **CLIFFORD J. PROUD**
> **U. S. MAGISTRATE JUDGE**

## Notice of Response Deadline

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(e), the parties shall file any objections to this report and recommendation on or before **March 10, 2008**. No further extensions will be granted.